ANDERSON, J.
delivered the opinion of the court.
This is a bill in equity to' enforce the specific performance of a contract for }he sale of land. The plaintiff alleges in his bill that he entered into the contract on the 1st day of April 1863 with William D. Ewing, Rebecca Ewing, Elizabeth and Mary A. Ewing, for the purchase of their tract of four hundred acres of land situate in the county of Augusta. This contract, which is exhibited with the bill, is signed and sealed by only' three of the vendors above named.
Mary A. Ewing in her answer avers that the contract *was not signed by her, or by any one professing to act for her, and is therefore not in any manner her contract. She denies that she made said contract, or authorized any one to make it for her, and* declines to perform it, or to allow any one to perform it for her. The statute requires contracts for the sale of land not only to be in writing, but to be signed by the party to be charged therewith, or by some one thereunto lawfully authorized. In this case the contract is not signed by the party sought to be charged, nor by any person for her, whether lawfully authorized or not.
But in the argument it was urged with great ingenuity and ability, that though she is not bound by the written-contract, there is evidence of a parol contract between her and the appellant through her agents, under which contract he paid the purchase money, and was let into the possession, which he has held ever since the 1st of July 1863, with the knowledge and acquiescence of the said Mary, until the filing of her answer in this cause on the 15th of June 1870; and that such part performance takes the case out of the Statute of Erauds.
The bill does not allege such a parol agreement. It sets out the written contract, and relies upon that as binding upon the *439 said Mary, upon the ground of her acquiescence, and that she is bound by the act of her joint tenants. Her answer is fully responsive to, and positively denies the allegations in the bill. And she being entitled to one undivided fourth part of the tract of land, the court is of opinion that she could not be divested thereof without her consent, not even by the act of her co-parceners. But is there proof of such a parol agreement on the part of Mary A. Ewing, as it alleged in argument?
'The appellant testifies that he made the contract *with Rebecca and Elizabeth Ewing; that neither William nor Mary were present when the contract was made, written and signed by«the said Rebecca and Elizabeth; but that they represented that they were authorized to sell the shares of William and Mary Ewing, and that they did sell to him the entire farm.
Elizabeth Ewing testifies that she did not positively undertake to sell the interests of William and Mary Ewing. She supposed that her brother and sister would be willing to accede to whatever they did under the circumstances, as they were very much annoyed, and very unpleasantly situated, and probably so represented to the appellant. But she says she referred the apjiellant to her sister, who was in Rockingham, and wrote to her brother, who was then acting as surgeon in the Confederate service in the Way Hospital at Eynchburg. And the proof is, that she placed his letter in reply in the hands of the appellant a few days after the contract was signed, and before its execution was completed. She says she had no positive written or verbal authority to receive money for either her brother or sister Mary, and received it at her own risk. Her testimony is strongly corroborated by the written contract, in which they only undertook to act for themselves, as they did not sign it for the absent, which seems to imply that they had no authority to do so.
But if they represented that they had authority to sell their absent brother and sister’s interests, and had no such authority, it could not bind them. Mary Ewing positively denies tha t she made the contract alleged in the bill, or authorized any one to make it for her, and refers to the paper itself, as showing that it was prepared upon the idea that she had a right to act for herself and would act for herself. Elizabeth *says that Mary objected to the contract the first time she saw her after it was written, which was a considerable time; but she heard that she had objected to it all the while. Daniel B. Ewing testifies that Mary, as far as he knew, never did consent to the sale, but that she has persistently and constantly, at all times, refused to ratify the transaction. 'The onus of proving the authority rests upon the appellant. The record is barren of any such proof. But it is contended that there was an acquiescence on the part of Mary from which the authority of her sisters to sell her interest may be inferred. The proof does not show acquiescence, but persistent and constant refusal, at all times, to ratify the contract. But she did not notify the appellant of her non-acquiescence. The paper was not signed by her, which he knew'; what further notice did he need? He alleges in his bill, that during the further continuance of the Confederate government matters stood as they w'ere; the parties not calling for any further payments, but rather avoiding the receipt of any more money; and that soon after the break down of the Confederate government, he learned, to his surprise, that they did not intend, if they could avoid it, to execute their contract. And in his first deposition he testifies that he had information, several months after the downfall of the Confederate government, that they did not intend to comply with the contract. And yet it is alleged, that he was not informed that Mary Ewing would not confirm the contract until after the filing of her answer; which was not tin til the 15 th of June 1870. He knew, two or three months after the contract was written, that she had not signed it; and he believed the contract was not complete without her signature. It is strange that after the close of the war, when he was informed that *the parties did not intend to comply with their contract, he had not enquired whether Mary Ewing had signed it, if he had not known that she repudiated it.
Mary Ewing does not seem to have made any concealment of her determination not to unite in the contract; and if he wished more explicit information as to what her determination was, it was his place to inquire. If he considered himself entitled to her signature, and that it was important that he should have it, he should have called on her to sign it, after he knew she had not signed it. She had never had any communication with him on the subject of a sale, and had never authorized any one to enter into a contract with him for the sale of her interest; and no such contract had been made for her, although a paper had been drawn for her to sign, if she was willing to do so, and thereby to become a party to the contract; which she did not sign. She may well have considered that her not signing it was sufficient notice to him that she was unwilling to unite in the contract. It did not devolve upon her to look him up to give him further notice of her determination; and he had no right to presume her ratification, because she had not done so. The court is of opinion that there is no sufficient proof of a parol authority to Rebecca and Elizabeth Ewing from their sister Mary to bind her by any contract of sale they may have made with the appellant, or indeed to show that they made a contract of sale on her behalf. And if there was no contract on her part, there could have been no part performance for her. Her sisters admit that they had no authority from her to receive the purchase money, and she denies that she had anything to do with placing the appellant in possession, who, in fact, *440 testifies that he got possession from Rebecca and Elizabeth.
*The allegation of the bill, that "WiHiam D. Swing entered into the contract on the 1st of April 1863, is not sustained by the proof. He was not present. And it appears from the evidence in the record, that Rebecca and Elizabeth Ewing, at the date of the contract, had no authority to sell his interest. The contract, signed by Rebecca and Elizabeth for themselves respectively, does not import an authority to them from their brother. One of them, Elizabeth, after negotiation had commenced with the appellant, wrote to him to know whether he would unite in the sale. This cotemporaneous act is confirmatory of what the written contract imports, and of the positive testimony of both Elizabeth and Rebecca, that at the time that contract was written and signed by them they had no authority to sell his interest in the land. This conclusion is put beyond all question by the letter itself, which they received in reply. It is in these words: ‘ ‘Mr. Kemper can have my share in the Riverton farm for $7,500, in his individual bonds, secured by lien on the land, one-half bearing interest from day of sale, the balance in two payments (equalannual).” This letter was not received until after the contract had been written, signed and sealed by the two sisters, and by Mr. Kemper, and most of the purchase money had been paid. The price agreed upon was $30,000 cash; and on the same day that the contract was signed as aforesaid, Mr. Kemper paid $10,500, and the next day, the 2d of April, he paid $15,009.33, as appears from the receipts signed by Rebecca D. Ewing. These payments were made in Confederate money. On the 7th of April he paid $1,000 in Confederate money, and gave his bonds for $3,490.67 in full of the Riverton farm; that is, one for $1,745.33 on demand, being one-half, and two others, one for $872.66% in twelve ^months, and the other for $872.66 in two years from the date of the contract. The bonds are payable to William D. Ewing. This ‘ last payment was made, and bonds executed after William D. Ewing’s letter was received and placed in the appellant’s hands and read by him. It is true, the appellant says that he does not remember to have read the letter; but both Rebecca and Elizabeth Ewing testify that it was placed in his hands to read, and that he opened it, and Elizabeth says he read it, and after meditating a while said it was more than he could give; and then after a while said: 1 ‘I will tell you what I will do, I have a thousand dollars with me, and if you will take that, I will execute my bonds for the balance. ’ ’ She says her sister Rebecca refused to touch it, because she knew her brother would be dissatisfied. “I consented to take the thousand dollars myself.” She says Mr. Kemper then wrote the bonds, signed them, and handed them to her. 1 ‘My sister did not look at them at all, and I did not have legal knowledge to know anything about their nature.” Rebecca testifies, “that when Mr. Kemper came, I saw my sister place the said letter in his hands.” He seemed to read it, then remarked, “I have one thousand dollars with me, if you will receive that I will execute my bonds for the balance. ’ ’ I remarked that I would not do it, for when my brother hears his requirements were not complied with he will be very much dissatisfied. “My sister said she would be responsible for the thousand dollars, and received it. The bonds were then prepared, signed and handed over.” Her testimony supports the testimony of Elizabeth; and both are corroborated by the fact that the written contract was changed; which required the whole $30,000 should be paid in cash, and the appellant paid only $1,000 in ^Confederate money of the balance due, and executed his bonds for the residue in exact compliance with the requirements of Dr. Ewing’s letter to that extent. He made the bonds payable to him. We think these facts tend strongly to show that he had read the letter, and to confirm the positive testimony of Rebecca and Elizabeth Ewing. The positive testimony of two unimpeached witnesses must outweigh the negative testimony of one witness, however respectable, that he don’t recollect, especially when the positive testimony is concurrent with the facts and circumstances of the case. The positive testimony of the two witnesses in this case is also against their own interest. We are therefore obliged to conclude that appellant made the payment of $1,000, and executed his bonds payable to William D. Ewing, knowing that it was contrary to the instructions he had given to his sisters, and not in accordance with the terms upon which he was willing to sell his interest; and if the case rested here, we could not hesitate -to refuse the enforcement of the contract against William D. Ewing.
But it is asserted that he afterwards ratified what had been done and signed the contract. That he signed it is not disputed. But he alleges in his answer that he signed it under the impression and with the belief that the terms he prescribed had been complied with. And that he never received, or saw or got the benefit of any Confederate or other money paid by the complainant, or authorized any one to receive it for him. In his deposition, taken and filed October 29, 1872, he testifies to the allegations thus made in his answer; and, unless invalidated, fully sustains the allegations. But it is attempted to invalidate it by showing that it is contradicted and disproved by himself in a subsequent deposition which he gave in the cause a few months afterwards. *The contradiction is alleged to be in his answer to this question: ‘ ‘In a former deposition by you in this cause, you stated, and in your answer you also said, that you had received no part of the money paid by Mr. Kemper, on account of the land in controversy. Your sister, Miss Elizabeth A. Ewing, has testified to-day that she paid over to your wife $1,000 of *441 Confederate money, received of Mr. Kemper while you were absent in the army. Please say when you first heard of that thousand dollars?”
He answers: “I never heard of it until after the war; X never saw the bonds of Mr. Kemper until after the war. I was under the impression from what I had heard, that I had Mr. Kemper’s bonds for $4,000,” &c.
On the 1st and 2d of April the appellant had paid $25,509.33, of the $30,000 he was to give for the land, leaving a balance of $4,490.67; and the subject of three depositions -which had been given just before Ewing’s said deposition was taken was chiefly in relation to that balance; how it was settled, &c. Elizabeth Ewing has just deposed — the same day — that Mr. Kemper handed to her $1,000 of it in Confederate money and his bonds for $3,490.67, amounting together to $4,490.67, the balance due for the Riverton farm; which she immediately handed to the wife of her brother. And it was now the point of inquiry, was not Ewing aware of this payment to his wife? Xlis answer is that he was under the impression he had Mr. Kemper’s bonds for the whole amount which he designated $4,000; though the exact amount was $4,490.67; and adds, !‘it was upon that impression that I signed the contract. After the war, when X came to examine these bonds, for the first time, being after this suit was brought, I discovered there were “'only $3,500 of bonds.” That is over the amount. There were only $3,490.67. It is evident he mentions these sums only for designation, not professing to give the exact amounts.
He was testifying in relation to the balance, which was the subject of previous depositions, for which he said he supposed he had Mr. Kemper’s bonds; and when, after the war, he found he had his bonds for only $3,500 ($3,490.67) he inquired where the other money was, and says, “for the first time I ascertained that mjr wife had received $1,000, which I never saw. ” The two depositions do not point to the same thing. The first was in relation to the consideration which he received for his interest in the land, which he was under the impression and belief was $7,500 in appellant’s bonds. The second was in relation to the sum which was unpaid when the bonds were executed — whether $1,000 of it was paid in money, and bonds executed only for the balance. His answer is, substantially, that he was not until after the war, and after this suit was brought. He was under the impression that he had the appellant’s bonds for the whole amount of it and not merely for $3,490.67. He says he expected to find bonds for the whole of that amount — but does not say what he expected for his entire interest in the land; that he had said in a previous deposition. The subject of this inqairy did not call for such an answer.
There is no contradiction. He does not say that he expected to find bonds for only $4,000 and no more. His meaning evidently is that he expected to find bonds for the whole of this balance, which he designates as'$4,000, and not for only a part of it. That was the matter of inquiry, whether he knew that a part of this balance of $4,490.67, to wit, one thousand’‘'dollars, had been paid in money. His answer is he did not until after the war. He believed he had bonds for the whole of it; but he does not say, nor mean to say, that was all for which he believed he had appellant’s bonds. He had shortly before said in his answer, and testified in his deposition, that he believed he had his bonds for $7,500. He did not mean to contradict that solemn asseveration, twice made just a few months before, in the same cause, and we do not think that he has contradicted it in this deposition. His attention was not called to the seeming discrepancy and an opportunity given him to explain. And we think it would be harsh and unjust upon such grounds to conclude that one of high character and respectability, a tribute paid by the appellant in his bill to all the appel-lees, had wilfully and deliberately sworn falsely.
The court is therefore of opinion that the most just and reasonable conclusion is that William D. Ewing signed the contract, as he alleges in his answer, and testifies, under the impression and belief that the appellant had executed his bonds to him, according to the terms he required in his letter of instructions to his sisters.
But conceding that he signed the contract under a mistake, as he alleges, is it equitable that he should rely upon it under the circumstances of this case? He signed the contract, and thereby ratified the act of his sisters, -who were acting for him, when they accepted the execution of the contract for his benefit, though not in strict compliance with the terms of his instructions. Undoubtedly the appellant regarded it as a complete ratification, and, so regarding it, he acted upon it. Relying upon this ratification by Ewing, he was induced to abide the contract, although it had not been signed by Mary; removed to the farm; was put *in full possession by Rebecca and Elizabeth, doubtless with the knowledge and consent of their brother, and has continued in the possession to this day. He did not take possession until after the contract was signed by Ewing. It may be fairly presumed that it was the turning point with him. If the contract had not been signed by Ewing, he had an election to hold on to the contract for so much of the land as he could get, or to surrender it, as he could not get all that was contemplated by his contract, get back his money, and make another investment of it. By this act of Ewing he was induced to take possession, which shows an election to abide the contract, and thus surrender his right to recall the money he had paid for it, and lost the opportunity of making other advantageous investments; and was most probably induced to believe that as he had signed the contract, Mary, his sister, would also sign *442 it, and thus was induced not to recall the money he had paid for her interest. By that act of Swing-, he was, in a word, induced to adhere to the contract, and not to abandon it, and to incur all the hopes he may have sustained by that choice, and to forego all the advantages which he might have derived by its early abandonment.
But the plea of Swing is, that he signed the contract under a mistake as to the facts. He does not pretend that he was led into that mistake by the appellant. Appellant had reason to believe that Swing was fully informed as to the facts when he signed the contract. They had but one brief interview, after the contract had been closed with Swing’s sisters, when he approached him in a way to impress him with the belief that he had been fully informed as to what had been done. “You have executed your bonds for the balance of the purchase money,” he said; appellant ^replied he had, and asked him to sign the contract, which he promised to do. There is not a single circumstance tending to show that Swing was misled or deceived by appellant, or that the latter had any reason even to suspect that he had not been accurately informed as to what had been done. And if Swing had used ordinary diligence and precaution, he could easity have known what had been done, and need not have been mistaken. He had only to have inquired of his sisters, one of whom was with him at Winchester, and traveled with him to his home in Harrisonburg, and they would doubtless have informed him of all that had been done before he signed the contract. And the appellant, it is fair to presume, believed that he had been fully and accurately informed by his sisters of what had been done, and that his signing the contract was done with his full consent, with an understanding of all the facts, and was an unqualified ratification-of whatever departure there had been, by his sisters from his instructions in accepting the terms which he proposed. Under these circumstances the court is of opinion that it would be inequitable to allow this defence of Dr. Ewing, and that he is bound by his solemn act of signing and sealing the written contract, for the sale of his interest in the Riverton farm to the appellant.
How is it with regard to Rebecca and Elizabeth Ewing?
The3>- entered into the contract for themselves, with their eyes open. And although they did so with the expectation that their sister would unite in it, we are clearly of opinion that they are bound — although she has refused to execute it and is not bound— if the appellant chooses to hold them to it. And as the appellant entered into the contract and paid his money *with the expectation of getting the whole farm, but is disappointed in getting the whole, by the refusal of Mary A. Ewing to sign the contract, he has the option to take three-fourths of the whole, or to get back his money which he paid for it at its scaled value.
But as to the money he paid Rebecca or Elizabeth over their and their brother’s shares, viz: $7,500, whether he is entitled to a decree against them for that, is not so clear. It is a total loss, and the question is upon whom it should fall? It was paid for the interest of Mary A. Ewing, provided, of course, that she united in the contract.
This payment by the appellant before the contract was signed by her was spontaneous and voluntary on his part. It does not appear that Rebecca or Elizabeth required it. And they both testify, against their own interest, that the3r had no authority from her to receive it.
They did not profess, in the written contract of sale, to act for her. The sale is not made by them as agents for their brother and sister, but it purports to be a sale made by each one in person for himself. Nqt having assumed authority to sell their sister’s interest, they can hardly be held to have assumed authority from her to receive the money which was paid for her interest. The receipt is given by Rebecca in her own name for the money, and not as agent. The appellant in pa3Ting the money to her upon her receipt, reposes in her a personal trust, that she would properly apply it. Would she have been justified in paying the money to Mary before she signed the contract? And was she bound to have notified the appellant of what he was alread3r informed, that Mary had not signed the contract? Mary had not signed when the money was paid; and was it for *Rebecca to determine how long the appellant should wait for her signing before she should return the money to him? She had no right to return the money to him as long as he held that Mary was bound by the contract of sale, which he holds to this day; and she had no right to pa3r the money to Mary until she had signed the contract, without his consent or direction.
It was incumbent on the appellant to call on Mary to sign the contract after he knew that she had not signed it. It no where appears that Rebecca or Elizabeth undertook to get her signature to it. Mr. Daniel Ewing was going to Harrisonburg, where she lived, and as a matter of favor, as much to appellant at least as to his sisters, agreed to take the contract with him to get Mary’s signature, and was instructed by appellant to leave it with Mr. Craig of Harrisonburg, showing that, he claimed the right to its possession. But Mr. Ewing assumed no obligation to have it signed; nor does it appear that the sisters, or either of them, assumed such an obligation. If it was necessary to have her signature to it; it was for the appellant to obtain it. If she refused to sign it, and he did not hold her bound, then it was incumbent on him to notify Rebecca, that he did not or could not hold Mary bound by the contract, and request her to return the money to him which he had paid for her interest; and if she had failed to do so it would have been at her risk, and would have been her loss. It was not for Rebecca to determine whether the *443 appellant held Marjr bound by the contract, and until he notified her that he did not, she was not warranted in paying it back to him. She did not hold the money, it is true, as agent for her sister, but she stood, as it were, a stake-holder between the parties, awaiting the action of the appellant (and he still holding her sister bound), before any notice *from him that he did not hold her bound, and request made to return the money to him, it was not proper that she should do so. She had no right to return the money paid to her for Mary’s interest, while the appellant held that Mary was bound by the contract of sale; and indeed he made no request of her to do so. The money lay invested with her own, awaiting the action of the appellant, and perished without fault on part of herself, or her sister Elizabeth. It was invested just as hundreds of our most prudent and judicious citizens and the courts of justice invested funds, and precisely as she and her sister Elizabeth invested their own, and was certainly as secure as the Confederate treasury notes she received from the appellant, if she had retained them. It was not their money; and we have held that it was not the money of their sister Mary. It was then lost — the money of the appellant; and we‘-think it would be inequitable to throw the loss upon Rebecca and Elizabeth Ewing, or either of them.
This case being one of great hardship, in whatever way decided, the court has given the most anxious consideration to the subject, satisfied that both parties to the transaction have acted with perfect good faith, but improvidently and under mistake. We regret that such a loss should fall on any one. We can only announce our conclusions as to the responsibilities of the parties under the law. In this case, we think the law, as we construe it, throws the loss where the hardship is less than if it had fallen upon Rebecca and Elizabeth Ewing. Their inheritance in the land is a total loss, whilst appell ant holds it in place of the Confederate money which he gave for it. He has something valuable for his Confederate money, even with this loss falling on him, whilst if it fell on them they would be losers not only of their inheritance, but would have *a large debt to pay, for which thej" have not and never did receive any sort of consideration: and this ruin brought upon them by a transaction in which, though they acted mistakenly, the court is well satisfied they acted with perfect good faith.
Upon +he whole case, the court is of opinion that the appellant should get three-fourths of the land in value, William D., Rebecca and Elizabeth Ewing’s interests, and that Mary A. Ewing should get the other fourth part, and recover from the appellant the rental value of the same from the date of filing the bill in this cause, with interest on the annual arrearages of rent until paid: Under all the circumstances of this case, the court being of opinion that it would be inequitable to hold the appellant liable for the rents of her share prior to the commencement of the litigation in relation to it. And the court is further of opinion, that William D. Ewing should recover from the appellant the scaled value of the bonds he executed to him at the date of the contract, with interest therefrom. And that the decree of the Circuit court be reversed so far as it is not in conformity with this opinion, and in all other respects be affirmed. And the cause is remanded, &c.
The decree was as follows:
The court is of opinion, for reasons stated in writing and filed with the record, that there is error in the said decree of the said Circuit court, in holding Rebecca D. Ewing and Elizabeth A. Ewing liable to the appellant for the value of the Confederate currency received by them in excess of three-fourths of the purchase money of the land in controversy, and in decreeing against them for the same; and also in allowing Mary A. Ewing rents for her share of the *land prior to the institution of this suit. It is therefore decreed and ordered that so much of the decree of the said Circuit court as gives to the appellant a recovery against Rebecca I). Ewing and Elizabeth A. Ewing of the value of the Confederate currency received by them in excess of the three-fourths of the purchase money of the land aforesaid, and as gives to Mary A. Ewing a recovery for the rents and profits of her one-fourth of the said tract of land prior to the institution of this suit in the said Circuit court, be reversed and annulled and that in all other respects it be affirmed. And the ap-pellees being the parties substantially prevailing, it is further decreed and ordered that the appellant do pay to the said appel-lees their costs by them about their defense here in this behalf expended. And this cause is remanded to the said Circuit court for further proceedings to be had therein to a final decree in conformity with the foregoing opinion and decree; which is ordered to be certified to the said Circuit court of Augusta county.
Decree reversed.